1999 UT 61

Cherese M. FRANKLIN, Plaintiff
and Appellant,

v.

Kenton Ray STEVENSON and Larae
Wall Stevenson Kiniry, Defendants
and Appellees.

No. 970016.

Supreme Court of Utah.

June 18, 1999.

Rehearing Denied Oct. 1, 1999.

David K. Isom, J. Preston Stieff, Mark O. Van Wagoner, Curtis L. Wenger, Salt Lake City, for plaintiff.

Walter F. Bugden, Tara L. Isaacson, Salt Lake City, for defendant.

HOWE, Chief Justice:

¶1 Plaintiff Cherese M. Franklin appeals from a final order granting defendant Kenton Ray Stevenson's motion for a judgment notwithstanding the verdict.

**BACKGROUND**

¶2 In 1992, after experiencing inexplicable panic attacks and hearing hallucinatory voices telling her to kill her infant daughter, Franklin began treatments with a psychologist, Dr. Laurie Hoover. Franklin's therapy included relaxation techniques such as deep breathing and self-reflective techniques such as "communicating" with her "inner child."

It was while she was under Dr. Hoover's care that Franklin began to "recall" previously "repressed" memories of abuse from her childhood. It is unnecessary for us to recount here the specific allegations of abuse. Suffice it to say the "memories" involved particularly heinous, traumatic acts.

¶3 At first, Franklin feared that her father had been the abuser. As her therapy progressed, she focused instead on Stevenson, a cousin approximately seven years her senior. Once she became convinced that Stevenson had committed the abuse, she filed this action against him. Stevenson's mother was also named as a party to the suit. Prior to trial, Stevenson filed a motion in limine questioning the reliability of (1) the theory of repressed memory, (2) the therapeutic methods used to recover the memories, and (3) Franklin's own testimony of her recovered and repressed memories. Additionally, in this motion, Stevenson requested the exclusion of the experts' testimonies regarding repressed memory in general and Franklin's memories in particular, based on a lack of inherent reliability. Furthermore, Stevenson requested that the trial court exclude any evidence and testimony—either from the expert witnesses or Franklin herself—derived from the memories that these therapeutic methods "recovered." The trial court did not rule on this motion until the conclusion of the plaintiff's evidence, when the trial court denied the motion. Following the presentation of all the evidence, Stevenson again moved for exclusion of testimony concerning repressed memory and recovery techniques, as well as any testimony or evidence derived from Franklin's "recapture of memory." The trial court also denied this motion. The jury returned a verdict against Stevenson, but in favor of his mother.[1]

¶4 Stevenson moved for a judgment notwithstanding the verdict ("j.n.o.v.") pursuant to Utah Rule of Civil Procedure 50, or in the alternative, a new trial pursuant to Utah Rules of Civil Procedure 50 and 59, or a remittitur. The trial court granted the motion for a j.n.o.v. The court drew a parallel

1. Franklin does not appeal from the judgment entered on the jury's verdict in favor of Stevenson's mother.

between hypnotic suggestion and communicating with one's metaphorical inner child and concluded that these therapeutic techniques were "hypnosis-like" in nature. In its order, the court ruled that Franklin "failed to establish, as a matter of law, the inherent reliability of the methods used to recover a memory." The court excluded this evidence and all related testimony from the record, then determined that insufficient evidence remained to support the jury's verdict against Stevenson; therefore, the court ruled, he was entitled to a j.n.o.v. Franklin now appeals.

## ANALYSIS

¶ 5 Franklin makes three assignments of error: first, that the trial court erred in striking her testimony following the jury verdict and thereafter granting a j.n.o.v.; second, that the trial court erred in equating hypnosis with the techniques Franklin's therapist used; third, that Stevenson waived all objections to this testimony by failing to object at the time the testimony was offered. We will address each issue in turn.

## I. JUDGMENT NOTWITHSTANDING THE VERDICT

■ ¶ 6 Franklin contends that the trial court erred in granting Stevenson's motion for a j.n.o.v. In addressing such a motion, a trial court must look at the evidence and all reasonable inferences in a light most favorable to the nonmoving party, granting the j.n.o.v. motion *only* if this examination demonstrates that there is insufficient evidence to uphold the verdict. *See Seale v. Gowans*, 923 P.2d 1361 (Utah 1996); *Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060 (Utah 1996); *Hansen v. Stewart*, 761 P.2d 14 (Utah 1988); Utah R. Civ. P. 59. On appeal, this court must apply the same standard. *See Braithwaite v. West Valley City Corp.*, 921 P.2d 997 (Utah 1996); *Gold Standard*, 915 P.2d at 1066; *Hansen*, 761 P.2d at 17.

### A. Abridging or Amending Record when Considering J.N.O.V. Motion

■ ¶ 7 Franklin argues that this court should recognize that "[a] judge cannot grant a directed verdict or judgment notwithstanding the verdict by ignoring evidence he has admitted on the ground that the admission was error." 21 Wright & Graham, *Federal Practice and Procedure* § 5041, at 229–30 (1977). Stevenson counters that in *Roche v. Zee* this court stated that the purpose behind Utah Rule of Civil Procedure 50 "is to permit the trial judge to submit the case to the jury for their determination, then if the verdict goes adverse to the moving party, he can, when there is more time for deliberation, re-examine and rule upon whether a jury question exists." 1 Utah 2d 193, 264 P.2d 855, 855–56 (1953). While we do not disagree with that statement, it does not follow that after a jury returns a verdict, a trial court may strike evidence already admitted into the record and thereafter grant a j.n.o.v. based upon the abridged record. We are not alone in disallowing a trial court to use an "abridged record" when deciding a j.n.o.v. motion. At least seven other courts have also expressed their disapproval of such trial court actions. *See, e.g., Jackson v. Pleasant Grove Health Care Ctr.*, 980 F.2d 692 (11th Cir.1993) (holding that trial court in deciding j.n.o.v. motion must consider record as presented to jury); *Douglass v. Eaton Corp.*, 956 F.2d 1339 (6th Cir.1992) (same); *Sumitomo Bank v. Product Promotions, Inc.*, 717 F.2d 215 (5th Cir.1983) (same); *Midcontinent Broad. v. North Cent. Airlines, Inc.*, 471 F.2d 357 (8th Cir.1973) (same); *Hernon v. Revere Copper & Brass, Inc.*, 363 F.Supp. 96 (E.D.Mo.1973) (same); *Pratt v. District of Columbia*, 407 A.2d 612 (D.C.1979) (same); *Townsend v. United States Rubber Co.*, 74 N.M. 206, 392 P.2d 404 (1964) (same). *But see Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110 (3d Cir.1987) (criticizing this position in dicta as unpersuasive). Because we now confront this issue for the first time, we adopt the rule first proposed by the *Townsend* court:

A motion for judgment notwithstanding the verdict, like a motion for a directed verdict, does not raise questions relating to the competency or admissibility of evidence. Therefore, in considering a motion for judgment notwithstanding the verdict, the evidence must be taken as it existed at the close of the trial, and evidence admit-

ted over objection cannot be excluded nor can evidence be included which was improperly rejected. Whether competent or incompetent, *all evidence submitted to the jury must be considered by the court in ruling on a motion for judgment notwithstanding the verdict,* and such a judgment cannot be entered on a diminished record after the elimination of incompetent evidence.

*Townsend,* 392 P.2d at 406 (emphasis added).

¶ 8 The Eleventh Circuit explained that the parties' reliance on the evidence prohibited a trial court from excluding or disregarding previously-admitted evidence when considering a motion for j.n.o.v.

If evidence is ruled inadmissible during the course of the trial, the plaintiff has the opportunity to introduce new evidence. However, when that evidence is ruled inadmissible in the context of deciding a motion for JNOV, the plaintiff, having relied on the evidence already introduced, is unable to remedy the situation.

*Jackson,* 980 F.2d at 696 (citing *Midcontinent Broad. Co.,* 471 F.2d at 358–59).

¶ 9 In *Jackson,* on numerous occasions, the defendant challenged the plaintiff's expert's qualifications. On each occasion, the lower court ruled that the expert was qualified. The *Jackson* court held that "[h]ad the district court ruled during trial that [the expert's] testimony was inadmissible, [the plaintiff] could have brought in another expert to testify as to the appropriate standard of care ..., thereby precluding [the defendant's] motion for JNOV." *Id.* Upon review of the trial proceedings below, it is evident that Franklin relied heavily upon the admission of this later-excluded evidence, as did the plaintiff in *Jackson.* We therefore hold that the trial court erred in granting the j.n.o.v.

### B. The Proper Remedy for Evidentiary Error

¶ 10 In so holding, however, we must next consider the proper remedy in such cases. The same cases which condemn granting a j.n.o.v. on an amended or abridged record also provide guidance regarding at least one proper remedy. Where evidence has been erroneously admitted during the course of a trial, instead of granting a j.n.o.v., the court may grant a new trial *where a motion for such has been made. See Jackson,* 980 F.2d at 696 n. 4; *Townsend,* 392 P.2d at 406. In the instant case, such a motion was made at the end of all the evidence. Stevenson moved for a j.n.o.v., or, alternatively, a new trial, or, alternatively, a remittitur. The trial court indicated that, as it granted the j.n.o.v., there was no need to reach Stevenson's motions for a new trial or remittitur, and therefore did not rule upon either motion.

¶ 11 Stevenson moved twice during the trial to exclude portions of the plaintiff's body of evidence: first, in a motion in limine, and second, in a motion at the conclusion of the presentation of all the evidence. In these motions, Stevenson objected to the reliability of both the recovery techniques and Franklin's own testimony concerning the recovered memories, as well as to the experts' testimonies regarding both the theory of repressed memory and Franklin's memories in particular. Also, the motions included objections to the admission of *any* evidence or testimony derived from the recovered memories. Although both motions were denied, the plaintiff was aware that Stevenson was attacking the quality of her evidence. There is no indication in the record that had the trial court granted one or both of Stevenson's motions, the plaintiff could have produced any new admissible expert testimony. This is not a case where, if the evidence had been ruled inadmissible during the course of the trial, the plaintiff could have produced new admissible evidence. As we conclude below, the trial court erred in not finding the plaintiff's experts' testimonies inadmissible. The plaintiff was not misled by this erroneous admission. It would be a waste of judicial resources to remand the case to the trial court for a ruling on Stevenson's motion for a new trial or a remittitur. Nothing would be gained by such a remand. It is unlikely that, if sent back, the plaintiff could meet the required foundational showing, which we discuss below. Franklin's experts stated that they were unaware of any documented support for these recovery methods. Based on

these testimonies, it is improbable that the trial court would be persuaded of the reliability of any new evidence which Franklin could offer. Therefore, we conclude that the proper remedy is to simply reverse the judgment entered on the jury's verdict.

## II. ADMISSION OF SCIENTIFIC EVIDENCE

### A. The Role of a Trial Judge

¶ 12    It is axiomatic that the trial judge is in a unique position to evaluate witnesses, evidence, and the trial in its entirety. *See, e.g., Valcarce v. Fitzgerald,* 961 P.2d 305, 314 (Utah 1998) (stating that trial courts "are in the best position to assess . . . the witnesses and to gain a sense of the proceedings as a whole"); *State v. Parsons,* 781 P.2d 1275, 1282 (Utah 1989) (stating that the trial judge has "broad latitude to control and manage the proceedings and preserve the integrity of the trial process"). As to the admission of scientific, technical, or other specialized evidence, when counsel has made a proper objection to its admissibility, a trial judge is charged with the responsibility of being a "gatekeeper to carefully scrutinize [the] proffered evidence." *State v. Ramirez,* 817 P.2d 774, 778 (Utah 1991). As gatekeeper, it falls to the trial court to ensure that such evidence proffered by either party meets the appropriate admissibility standard. *See id.*

### B. Admission of Expert Witness Testimony Regarding Scientific Evidence

¶ 13    Rule 702 of the Utah Rules of Evidence, governing expert testimony, states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." However, in order for *new* scientific evidence to be admissible, a threshold reliability test must be met. This court established that test nearly a decade

ago in *State v. Rimmasch,* 775 P.2d 388 (Utah 1989), where we required a foundation establishing the reliability of the scientific evidence. We stated that "evidence not shown to be reliable cannot, as a matter of law, 'assist the trier of fact to understand the evidence or to determine a fact in issue' and, therefore, is inadmissible." 775 P.2d at 397–98 (quoting Utah R. Evid. 702). In making such an analysis, a trial court may either (1) take judicial notice of the "inherent reliability" of the evidence or (2) determine the inherent reliability after a hearing on the issue. *Id.* at 398.

¶ 14    The threshold level required for judicial notice of scientific evidence is quite high, but once that threshold has been established, the evidence is thereafter admissible, subject to "a weighing in each case of its probativeness against its potential for unfair prejudice." *Id.* at 401 (citing *State v. Tanner,* 675 P.2d 539, 543–44 (Utah 1983)). In *Rimmasch,* where this court was asked to take judicial notice of "child abuse profile evidence,"[2] we held that we were unable to take judicial notice of the reliability of the scientific techniques behind such profile testimony, stating: "Not only is there a *lack of any consensus* about the ability of the profile to determine abuse, but the scientific literature raises serious doubts as to the reliability of profile testimony when used for forensic purposes to demonstrate that abuse actually occurred." 775 P.2d at 401 (emphasis added) (citations and footnotes omitted). Where scientific testimony or evidence is proffered, and judicial notice is inappropriate for reliability reasons,

> the proponent of [such] scientific evidence . . . must make an initial foundational showing that convinces the trial court that the principles or techniques underlying the proffered testimony meet [the] standard of inherent reliability before the trial court can proceed to consider the normal foundational questions appropriate to any expert testimony. In the absence of such an initial showing, the evidence is to be excluded.

---

**2.**  Profile evidence consists of "various behavioral and psychological traits [often] characterized as being typical of sexually abused children." 775

P.2d at 394.   Such traits are usually very general descriptive terms; namely, "guilt," "anxiety," "nightmares." *Id.* at 401.

*Rimmasch,* 775 P.2d at 398 (citing *Phillips v. Jackson,* 615 P.2d 1228, 1236 (Utah 1980); *Kofford v. Flora,* 744 P.2d 1343, 1347–48 (Utah 1987)). In sum, while a trial court may "'tak[e] into account general scientific acceptance and widespread practical application,'" 775 P.2d at 397 (quoting *Phillips,* 615 P.2d at 1234), absent a showing of the *reliability* of scientific principles or techniques, such evidence must be excluded.

To quote a prior decision by this court:

[Q]uestions may be raised *with respect to therapeutic methodologies used to revive memories because they may induce memories of events that never happened.* The concern with respect to the reliability of memories revived in therapy is a matter of some scholarly debate.

Because of the dearth of empirical scientific evidence regarding the authenticity and reliability of revived memories, *the inherent reliability* and admissibility of expert witness testimony regarding memory repression and revival *may be an issue that will have to be reached at trial.*

*Olsen v. Hooley,* 865 P.2d 1345, 1349–50 (Utah 1993) (emphasis added) (citations and footnotes omitted). In the words of another court:

[T]he proffered expert must be able to assure the Court that his/her theories have some degree of scientific validity and reliability. In particular, the witness should testify as to whether that theory can be, or has been, tested or corroborated and, if so, by whom and under what circumstances; whether the theory has been proven out or not proven out under clinical tests or some other accepted procedure for bearing it out; and whether the theory has been subjected to other types of peer review. In establishing this, the expert must show that any underlying data and studies upon which he/she relies are of a type reasonably relied upon in his/her field.

*Isely v. Capuchin Province,* 877 F.Supp. 1055, 1064 (E.D.Mich.1995). We find these directions to be instructive in trial court-level inquiries into the reliability of scientific evidence.

¶ 15 On cross-examination in this case, Stevenson elicited concessions from both of Franklin's expert witnesses, Dr. Bessel van der Kolk, and Franklin's therapist, Dr. Laurie Hoover, regarding the lack of scientific foundation for the therapeutic techniques Dr. Hoover used with Franklin. Specifically, Dr. van der Kolk testified as follows:

Q. Is there any scientific literature, any studies that you are aware of that have been done that show that asking a question with one hand and answering the question with the non-dominant hand is a mechanism by which you can recover an accurate memory of the past? Are there studies?

A. It's interesting that you ask the question, actually, because this great Frenchman who knew more about trauma than anybody else, Pierre Jenet ... in 1889 in his book ... actually wrote about that very phenomenon.

. . . .

Q. Did his study deal with the issue of validating the accuracy of the recovered memory, Doctor?

A. No, he didn't.

Q. Thank you. And are you aware of a single study as of 1996 that has validated this as a reliable technique for recovering memory, Doctor?

A. Not to my knowledge.

Q. Thank you.

On re-direct, Franklin focused on the scientific acceptability of repressed memory itself and did not address the techniques used to recover the memories or the reliability of such techniques. Similarly, on cross-examination, Stevenson educed the following testimony from Dr. Hoover:

Q. Do you believe that there is any scientific evidence to suggest that I could ask myself [a question] and I could answer that question with my non-dominant hand and expect that I'm really getting the truth?

A. Is there any scientific evidence? I'm not aware of any studies specifically done non-nondominant handwriting to support or disprove that. It is a common clinical technique.

Franklin did not follow up on this testimony either, declining a re-direct examination of Dr. Hoover.

¶ 16 Stevenson raised questions and concerns regarding the "therapeutic methodologies" and the "revived memories" numerous times during the trial, pointedly querying the expert witnesses concerning the reliability of and foundation beneath these therapeutic techniques. Franklin, however, declined to address the issue with the witnesses. Understandably, we are therefore left—as was the trial judge—in the wake of an *Olsen*-like "dearth of empirical scientific evidence regarding the ... reliability" of the therapeutic techniques with serious questions and doubts concerning the reliability of those self-same techniques. 865 P.2d at 1350. Neither expert could assure the trial court that the therapeutic methods at issue had *any* degree of scientific validity or reliability. Neither witness could testify regarding any testing or corroboration of the techniques Dr. Hoover employed, let alone the acceptance or review of those techniques by their peers. In short, neither witness's testimony evokes confidence in the reliability of the scientific evidence. Neither the record nor our research indicate that these techniques enjoy a general acceptance within the field,[3] and we are not persuaded that the trial court could have properly taken judicial notice of the reliability.

¶ 17 Franklin's evidence clearly did not meet the initial foundational showing of reliability that *Rimmasch* requires. While no formal evidentiary hearing was held, the trial court accorded Franklin every opportunity during the trial to lay this foundation and address this issue. In the end, the trial court should have found the evidence inadmissible, inasmuch as Stevenson, as hereinafter discussed, made a proper objection to its admission. Instead, by admitting the evidence, the trial court failed in its gatekeeping role. The trial court recognized this when it granted the j.n.o.v.

¶ 18 Not only has this court held that unreliable techniques are inadmissible as evidence, but also that any expert testimony based upon unreliable techniques is also unreliable and inadmissible. For example, *Rimmasch* held that the trial court improperly admitted expert testimony based upon unreliable scientific evidence, stating:

> Although the court made a finding that ... [the] expert witnesses were experts, *it made no determination that the scientific principles and techniques upon which their testimony was to be grounded were reliable.* This is understandable because there was no evidence before the court from which any such determination could be made. .
>
> . . . .
>
> For the foregoing reasons, we find that the trial court violated Utah Rule of Evidence 702 when it admitted the expert testimony founded upon the psychological profile.

775 P.2d at 404 (emphasis added). As in *Rimmasch,* the recovery techniques at issue in this case were unreliable. As a consequence, the portions of Franklin's experts' testimonies based on those techniques were also unreliable and inadmissible.

### C. Admission of Lay Witness Testimony Based on Scientific Intervention

██ ¶ 19 We have also held that, under certain circumstances, inadmissible evidence taints a lay witness's testimony which was based on that evidence. In *State v. Tuttle,* 780 P.2d 1203 (Utah 1989), we addressed the admissibility of a lay witness's testimony after the witness had been hypnotized to obtain more complete descriptions of the accused and other additional details of the scene of the crime. We stated: "The policy of these threshold reliability tests applies to hypnotically enhanced testimony just as much as it

---

3. In fact, our research suggests that the idea of memory repression itself, let alone the methods of recovery, is a point of disagreement within the medical, psychiatric, and psychological communities. *See, e.g.,* Douglas R. Richmond, *Bad Science: Repressed and Recovered Memories of Childhood Sexual Abuse,* 44 U. Kan. L.Rev. 517, 564–65 (1996) (discussing views of the American Medical Association, the American Psychological Association, and the American Psychiatric Association); Julie M. Kosmond Murray, *Repression, Memory, and Suggestibility: A Call for Limitations on the Admissibility of Repressed Memory Testimony in Sexual Abuse Trials,* 66 U. Colo. L.Rev. 477, 498–504 (1995) (same).

applies to the testimony of experts because even if the one actually testifying is a lay witness, the hypnotically enhanced testimony given by the witness is the product of scientific intervention." *Id.* at 1211. Similarly, Franklin's testimony about her recovered memories are the product of scientific intervention.[4] Accordingly, this testimony is tainted by the unreliability of the recovery methods used, and is therefore inadmissible.

¶ 20   At this time, however, we find it appropriate to repeat our caveat from *Rimmasch*. We do not pretend to suggest that our analysis has encompassed all the literature in the field, and we do not mean to imply that these techniques *are conclusively unreliable* as a matter of law. Instead, we simply determine that the *necessary threshold reliability* of these techniques was not established in the instant case. *See* 775 P.2d at 403. Trial judges, therefore, must continue to explore this issue in individual cases and determine the reliability—or lack of reliability—of such techniques when counsel has made a proper objection to such evidence.

### III. EQUATING HYPNOSIS WITH TECHNIQUES AT ISSUE

¶ 21   Franklin next contends that the trial court erred when it equated hypnosis with the various therapeutic techniques Dr. Hoover used on Franklin. While hypnotically refreshed memory and hypnotically enhanced testimony is "inherently unreliable and inadmissible as evidence" in Utah courts, *Mitchell*, 779 P.2d at 1119, we agree with Franklin's position. There is insufficient evidence before us to conclude that the two forms of therapies are sufficiently similar to warrant a wholesale condemnation of the therapeutic techniques at issue in this case. However, as stated above under the *Tuttle* analysis, because the scientific reliability of the foundations on which these so-called "relaxation techniques" are based was not established, the testimony based on memories recovered through use of those techniques is thereby tainted.

### IV. ALLEGED WAIVER OF OBJECTION TO ADMISSION OF EVIDENCE

¶ 22   Finally, Franklin asserts that Stevenson waived all objections to Franklin's testimony by failing to timely object to it and that Stevenson "made a strategic choice not to object to [Franklin's] testimony on any ground. That decision constituted a waiver of any possible evidentiary defect.... [Stevenson] has failed to preserve whatever potential evidentiary objection he may have had either for a post-trial motion or for this appeal." Franklin relies on several cases in support of this assertion. *See State v. Tillman*, 750 P.2d 546, 551 (Utah 1987) (citing general rule of appellate review requiring "contemporaneous objection" or "specific preservation" for review on appeal); *State v. Lesley*, 672 P.2d 79 (Utah 1983) (upholding necessity to object to evidence to preserve issue for appeal even where pretrial motion to suppress evidence had been made and denied); *Broberg v. Hess*, 782 P.2d 198 (Utah Ct.App.1989) (refusing to address alleged error "[b]ecause there was no timely objection"). We agree with the necessity for both specific preservation and timely objections before this court will address issues on appeal. However, we are not persuaded by Franklin's argument.

¶ 23   The *Lesley* court held that the failure to make either a contemporaneous objection or some specific preservation of a claim of error precluded the appellate review of the admissibility of evidence, where a pretrial motion to suppress had been made and denied. 672 P.2d at 82. That case is inapposite to the present case; here, the pretrial motion in limine was not denied until after the presentation of the plaintiff's evidence. *Broberg* is not controlling, as it merely requires *some* objection to the alleged error be made at some point to the trial court. 782 P.2d at 201. Here, Stevenson made an objection. He moved in limine to exclude any evidence and testimony derived from memo-

---

4.   Scientific intervention may actually have had a greater degree of influence on Franklin's testimony. The hypnotized witness in *Tuttle* at least had a basic memory of the information intact prior to

hypnosis. Here, Franklin's entire memory of the events owes its existence to the intervention and use of Dr. Hoover's therapeutic methodology.

ries Franklin recovered with Dr. Hoover's therapeutic methods. The trial court did not rule on the motion until the end of the plaintiff's case, and the motion acted as a continuing objection to the admission of the evidence at issue. We therefore conclude that Stevenson did not waive his objection to Franklin's testimony.

## CONCLUSION

¶ 24 Based on the foregoing analysis we hold that the trial court improperly abridged the record by excluding previously admitted evidence before considering Stevenson's motion for j.n.o.v. We also hold that the trial court improperly allowed this inadmissible evidence into the record in the first place. Accordingly, we reverse both the trial court's order for j.n.o.v. and the judgment against Stevenson.

¶ 25 Associate Chief Justice DURHAM, Justice STEWART, Justice ZIMMERMAN, and Justice RUSSON concur in Chief Justice HOWE's opinion.

